# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

T-MOBILE USA, INC.,

                Petitioner,

      v.

NATIONAL LABOR RELATIONS BOARD,

                Respondent.

No. 22-1310
(consolidated
with 23-1002)

## UNDERLYING DECISION FROM WHICH THE PETITION ARISES

Pursuant to the Court's December 8, 2022 Order, Petitioner T-Mobile USA, Inc. attaches hereto as Exhibit A the underlying decision of the National Labor Relations Board from which the Petition arises.

Dated:  January 9, 2023           Respectfully submitted,

                              */s/ Mark Theodore*

MARK THEODORE                MARK D. HARRIS
PROSKAUER ROSE LLP         PROSKAUER ROSE LLP
2029 Century Park East        Eleven Times Square
Suite 2400                    New York, NY 10036
Los Angeles, CA 90067        Tel: (212) 969-3530
Tel: (310) 557-2900          mharris@proskauer.com
mtheodore@proskauer.com

*Counsel to Petitioner T-Mobile USA, Inc.*

# EXHIBIT A

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**T-Mobile USA, Inc. and Communications Workers of America, AFL–CIO.** Case 14–CA–170229

November 18, 2022

SUPPLEMENTAL DECISION AND ORDER

BY MEMBERS RING, WILCOX, AND PROUTY

Section 1 of the National Labor Relations Act declares that it is the policy of the United States "to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred" by "protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives *of their own choosing*" (emphasis added). In furtherance of this policy, Section 8(a)(2) of the Act makes it an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." And Section 2(5) of the Act defines "labor organization" as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

In 2015, the Respondent created T-Voice as a vehicle through which its customer service representatives could bring work-related issues to its attention. There is no dispute that the Respondent dominates T-Voice. The question presented in this case is whether T-Voice is a labor organization.

On September 30, 2019, the National Labor Relations Board issued a Decision and Order in this proceeding, in which it found, among other things, that T-Voice is not a labor organization and that the Respondent therefore did not violate Section 8(a)(2) of the Act by maintaining, dominating, and assisting it.[1] On April 16, 2021, the United States Court of Appeals for the District of Columbia Circuit granted the Union's petition for review of this finding and remanded the case to the Board.[2] On August 13, 2021, the Board notified the parties that it had decided to accept the court's remand and invited them to submit statements of position. The Respondent, the General Counsel, and the Union filed statements of position.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has reviewed the entire record in light of the court's decision, which is the law of the case, and the parties' statements of position. For the reasons discussed below, we find that T-Voice is a labor organization under Section 2(5) of the Act. Accordingly, we find that the Respondent violated Section 8(a)(2) and (1) of the Act by dominating and assisting it.

I.

*A. Facts*

The Respondent, a national wireless communications carrier, operates 17 call centers in the United States. It employs customer service representatives (CSRs), who handle customer calls at those centers. Since 2009, the Union has been attempting to organize the CSRs.

For many years, the Respondent solicited CSRs' feedback through various channels, including employee surveys, focus groups, and an open-door policy. In 2015, the Respondent established T-Voice. The T-Voice charter stated that its mission was to "[e]nhance Customer[] and Frontline [employee] experience by identifying, discussing, and communicating solutions for roadblocks for internal and external customers." The purpose of T-Voice, as its charter further stated, was to "[p]rovide a vehicle for Frontline feedback and create a closed loop communication with T-Mobile Sr. Leadership Team."[3] The Respondent is the sole source of financial support for T-Voice.

The Respondent began T-Voice as a pilot program at a few call centers and then expanded the program to all call centers. In a June 2015 email to CSRs announcing the national roll-out, Executive Vice President Brian Brueckman stated that T-Voice is comprised of "Frontline Representatives from each call center" and "Site Senior Managers and support team members."[4] He explained that "[t]heir job is to raise Frontline and customer pain points to ensure they are resolved and then results are communicated back to the Frontline."[5] Brueckman told the CSRs that they could "raise issues by reaching out to [their] T-

---

[1] 368 NLRB No. 81 (2019) (*T-Mobile I*).

[2] *Communications Workers of America, AFL–CIO v. NLRB*, 994 F.3d 653 (D.C. Cir. 2021). The court denied the Union's petition for review with respect to the Board's finding that the Respondent did not violate Sec. 8(a)(1) by soliciting grievances and impliedly promising to remedy them during an ongoing union campaign. Id. at 659. Members Wilcox and Prouty took no part in the original decision, *T-Mobile I*, supra, and expresses no opinion as to whether this allegation was correctly decided by the Board.

[3] "Frontline" refers to CSRs, as they deal directly with customers.

[4] "Site Senior Managers" included the senior manager of the customer service group from each call center and a second in command. "Support team members" included Vice President Kathy Woods, Customer Service Manager Dave Thompson, Senior T-Voice Program Manager Kimberly Tolman, Senior Analyst Ryan McDonald, and two administrative staff members.

[5] "Pain points" are complaints, concerns, or suggestions.

2                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Voice representatives." The Respondent selected three to five CSRs from each call center and paid them to serve as T-Voice representatives for 4 hours a week as scheduled by their site senior managers. Their term of service was initially 6 months, but it was later extended to 9 months.

Generally, the T-Voice program served two functions: (1) solicitation, collection, and submission of pain points through a SharePoint database, and (2) discussion, during regular meetings of T-Voice representatives with site senior managers and/or support team members, of the representatives' activities. The primary duties of T-Voice representatives were to collect pain points and to enter them into SharePoint substantially as conveyed by the submitter, subject to minor grammatical or clarifying edits. T-Voice representatives submitted their own pain points as well. T-Voice representatives also solicited pain points during face-to-face meetings.[6] Once pain points were entered into SharePoint, they were assigned to customer experience managers, who evaluated each pain point and entered a response in SharePoint. T-Voice representatives then relayed to CSRs management's response to their pain points.

Most of the pain points T-Voice representatives transmitted to management through SharePoint dealt with customer matters, ranging from billing issues to complaints about the music customers were subjected to while on hold (customer pain points). But a significant number of pain points related to employees' terms and conditions of employment (employee or "Frontline" pain points), such as paid time off, awards, and metrics for measuring employee performance, the last of which affected bonuses and scheduling, i.e., higher-performing CSRs were rewarded with desired work schedules. From time to time, the Respondent announced to employees that it had implemented suggestions solicited through T-Voice and credited those changes to the T-Voice "team." Such changes included, for example, an employee loyalty program that gave CSRs milestone anniversary gifts, a charging station in the employee break room, and free Wi-Fi access. The administrative law judge found, and we agree, that prior to February 2016, when the Union filed the charge in this

case, the Respondent encouraged employees to raise any and all pain points to their T-Voice representatives.[7] Thereafter, the Respondent limited T-Voice to customer pain points.

On a few occasions, T-Voice representatives emailed pain points directly to management. One T-Voice representative emailed Vice President Woods to suggest that certain customer issues could be assigned to the Respondent's Solution Center for resolution. That email was forwarded to Senior T-Voice Program Manager Tolman, who then assigned the pain points to a customer experience manager, just like pain points submitted through SharePoint. But when another T-Voice representative emailed Senior Vice President Callie Field with a request for 45 dual monitors for CSRs in the Dedicated Care Department, the Respondent reviewed the costs of the monitors and then granted the request. Also, one T-Voice representative emailed Vice President Sid Bothra to suggest a new performance metric for his department. Bothra responded that he would have his team look into it.

T-Voice representatives regularly met with managers in charge of the T-Voice program. During weekly local meetings, T-Voice representatives and site senior managers sometimes discussed the number of pain points submitted and identified significant or recurring pain points.[8] During monthly regional meetings, they shared best practices for gathering pain points and occasionally discussed pain points that had been submitted. In an email, Senior Manager Chad Appleton expressed an interest in hearing "what people think about" a particular change the Respondent had made to its calculation of call-resolution time, a metric used to evaluate CSRs' performance.

National T-Voice meetings were also held monthly (telephonically) with site senior managers and support team members. Tolman prepared the agenda for these meetings. In advance of them, Tolman sometimes asked T-Voice representatives to consider certain brainstorming questions and solicit additional feedback from CSRs at their call centers.[9] During the meetings, managers usually informed T-Voice representatives of the Respondent's

---

[6] Such face-to-face meetings included "table days" and "knowledge checks." During table days, T-Voice representatives set up a table at which they spoke to CSRs about new devices or promotions. At those times, employees could drop pain points into a collection box on the table. During knowledge checks, T-Voice representatives meet briefly with small groups of CSRs to check their awareness of new company developments. At the end of the checks, T-Voice representatives usually asked if anyone had a pain point to submit.

[7] In so finding, the judge relied on the testimony of CSRs Jason Vann, Patrick Hernandez, Victoria Singer, and Kevin Elder. We reject the Respondent's hearsay objection to the admission of this testimony into evidence. As the judge found, the testimony, even if some of it was hearsay, was corroborated by other evidence, including the Respondent's

SharePoint log showing what pain points were submitted. See *Meyers Transport of New York*, 338 NLRB 958, 969 (2003) (holding that hearsay is admissible if "rationally probative in force and if corroborated by something more than the slightest amount of other evidence").

[8] In this regard, Senior Manager Melissa Kozlowski testified: "[W]e review what events they've done throughout the week, how many pain points have they submitted, is there a major one that needs to have my attention brought to it, if it's one that they're consistently hearing on the floor. . . . And then we plan out their future weeks of events."

[9] The agenda for the August 19, 2015 national meeting included an update on changes the Respondent made to a customer-satisfaction metric. The top three pain points listed on the agendas for the September 2015 and March 2016 meetings were all customer pain points.

resolution of the previous month's top three pain points.[10] T-Voice representatives also had an opportunity to ask clarifying questions and make suggestions. For instance, after receiving an update on the Respondent's new device insurance plans, T-Voice representatives provided feedback on the language to be used in materials for training CSRs on the update, and the Respondent edited the language accordingly. In addition, a T-Voice representative made other suggestions, including that device emulators be provided to CSRs to aid them in troubleshooting problems with customers' devices. Senior Analyst McDonald promised to provide updates on the suggestions on the next month's call or sooner. At another meeting, a T-Voice representative suggested that a script be provided CSRs for explaining how phone exchanges work. The Respondent added that suggestion to "the list of things to relook."

National meetings often included focus groups run by Tolman. Issues addressed in these focus groups largely concerned customer pain points, such as "situations where customers g[o]t backed into a corner and d[idn't] have a clear way out," "general perceptions about our network," "what sort of pains [] people express[ed] with respect to payments," and "specific issues or services [for which] customers [were] directed to a [T-Mobile] store for resolution."[11] During a focus-group meeting on coverage and network, however, T-Voice representatives not only shared their interactions with customers but also recommended "training in sites for coverage device set-up" and "network-specific talking points to help address customer questions." Tolman emailed notes from this meeting to the T-Voice Team and the Customer Service Leadership Team.[12]

The Respondent also held national, in-person T-Voice summits in October 2015 and May 2016. These 2-day summits were attended by all T-Voice representatives plus many senior managers. Prior to the 2015 summit, Tolman emailed the T-Voice team topics for focus groups, including "Employee Engagement / T-Mobile Culture," "Metrics," "Systems / Tools," and "Frontline Readiness." She noted, however, that T-Voice representatives "could provide feedback on any of these topics . . . at random." Notes from the "Metrics" focus-group meeting indicate that T-Voice representatives suggested changes to the way CSR metrics are calculated, including dropping the high and low scores on customer-satisfaction surveys and

excluding from the calculation of a particular metric calls of less than 45 seconds. A copy of the minutes of the meeting was forwarded to other managers for discussion. An article the Respondent posted on the T-Mobile intranet stated that the summit had offered an "opportunity to discuss, strategize and resolve top pain points."

At the 2016 summit, each of five T-Voice representatives presented a high-impact customer pain point and his or her suggestions for resolving it. One T-Voice representative identified an onerous process for restoring customer access to locked accounts as a top pain point and suggested a way to streamline the process. After the summit, the Respondent announced that it was fixing the T-Mobile.com login process.

### B. Prior Board Proceedings

The administrative law judge found that T-Voice was a labor organization within the meaning of Section 2(5) of the Act. Specifically, the judge found that employees participated in T-Voice on a representative basis, and that T-Voice existed, at least in part, for the purpose of dealing with the Respondent concerning issues impacting employees. Regarding "dealing with," the judge reasoned that "employees effectively made proposals" to management—citing pain-point entries in SharePoint concerning the loyalty program, paid time-off, and metrics used to evaluate CSRs' performance—to which management responded. She observed that T-Voice representatives did not just screen pain points but participated in focus groups, "which . . . implie[d] a bilateral mechanism, beyond brainstorming, to address pain points." Having found that T-Voice was a labor organization, she concluded that the Respondent dominated its formation and administration in violation of Section 8(a)(2).

The Respondent did not except to the judge's finding that the Respondent dominated T-Voice, but it did except to her finding that T-Voice was a labor organization. Finding merit in the exception, the Board in *T-Mobile I* reversed the judge's decision in relevant part. The Board did not pass on whether T-Voice representatives acted in a representative capacity. Rather, it focused on whether T-Voice representatives dealt with the Respondent, i.e., whether they "engaged in a bilateral mechanism through which they made proposals to management and management responded to these proposals by acceptance or rejection by word or deed." *T-Mobile I*, 368 NLRB No. 81, slip op. at 6 (emphasis omitted). Answering that question in

---

[10] In late summer of 2016, Tolman implemented a new procedure: identify the top pain points based on the number of items submitted that month and have T-Voice representatives vote on which of them most negatively affected customers' experience.

[11] Kozlowski likewise explained that "if we had to give feedback on a training . . . , we would ask the T-Voice representatives to give us

feedback on does this make sense, is the flow right, would that systematically work as you're taking a call."

[12] The record does not disclose who were the members of the Customer Service Leadership Team.

4                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

the negative, the Board found that T-Voice representatives primarily served as a conduit for transmitting pain points submitted by other employees to the Respondent. While acknowledging that some individual T-Voice representatives also submitted their own proposals, the Board found insufficient evidence that those proposals were submitted by T-Voice *as a group*. As to the meetings and focus groups, the Board acknowledged that some of the T-Voice representatives' feedback was phrased in the plural, but stated that "no suggestion was reported to be coming from 'reps.'" Id., slip op. at 9–10. Although the Respondent, in communications to employees, credited T-Voice for changes in certain conditions of work, the Board dismissed this evidence on the basis that the record did not establish whether the cited changes resulted from proposals advanced by T-Voice as a group or by individual T-Voice representatives.

### C.  The Court's Decision

The Court of Appeals for the D.C. Circuit granted the Union's petition for review of the Board's decision. As the court recognized, *T-Mobile I* was premised on the "view that an organization does not engage in 'dealing with' an employer unless it makes 'group proposals' to the employer" and that "proposals from individual members of the group would not be sufficient." 994 F.3d at 660. The court held that this conception of "dealing with" was problematic, as follows. First, the court stated that precedent not addressed in *T-Mobile I* does not support the standard the Board adopted, citing *Dillon Stores*, 319 NLRB 1245 (1995), and *Reno Hilton*, 319 NLRB 1154 (1995). The court noted that other cases, on which the Board in *T-Mobile I* did rely, do support the principle that "an organization is not engaged in 'dealing with' an employer unless the organization makes 'group proposals,' which would require some process for adopting or advancing them as proposals of the organization." 994 F.3d at 662.[13] But the court observed that none of the cases on which the Board relied in *T-Mobile I* "held that an organization in which *employee representatives* make proposals to management does not constitute a labor organization unless those proposals are adopted by the group." 994 F.3d at 663 (emphasis added). "The Board's reliance on a 'group proposals' requirement therefore broke new ground." Id. The court was "left uncertain about what the record must show for the Board to find that an organization made group proposals." Id. It asked, "Is it enough that an employee representative makes a proposal while acting in a representative capacity?" Id. The court observed that "there might be a substantial-evidence problem" with finding that T-Voice employee representatives were *not* acting in a representative capacity "given that the members of T-Voice were titled 'representatives' and told to gather input from other employees at their call centers prior to their participation in meetings." Id. Or "[p]erhaps more is required, such as a formal vote adopting the proposal as one of the 'group.'" Id. The court noted that such a position, however, "could be difficult to reconcile with the Board's statement [in *Electromation*, 309 NLRB at 994] that a labor organization can 'lack[] a formal structure' and have no 'constitution' or bylaws.'" Id. Moreover, it "might be easily circumvented [so as to] undermine the function of Section 8(a)(2)." Id. Finally, the court noted, the Board might intend "a more fact-intensive course between these extremes." Id.

### II.

We have carefully examined the entire record in light of the concerns articulated by the D.C. Circuit. After careful consideration, we agree with the court that the Board erred in its prior decision in this case by failing to determine, and take into account in its analysis, whether T-Voice employee representatives served in a representative capacity. For the reasons explained below, we find that they did and that proposals made to management by T-Voice employee representatives *as* T-Voice representatives constituted group proposals. Moreover, some of those proposals concerned conditions of work, and management considered those proposals and, in some cases, responded by acceptance or rejection by word or deed to an extent sufficient to establish a pattern or practice of proposal and response. See *Electromation*, 309 NLRB at 995 fn. 21 (defining "dealing with" as "a bilateral mechanism involving proposals from the employee committee concerning the subjects listed in Sec. 2(5), coupled with real or apparent consideration of those proposals by management"). Accordingly, T-Voice was an employee representation committee in which employees participated and that existed, at least in part, for the purpose of dealing with management concerning conditions of work. We therefore find that T-Voice was a labor organization under Section 2(5) of the Act. The Respondent no longer disputes that it dominated and supported T-Voice. Accordingly, the Respondent violated Section 8(a)(2) of the Act.

### A.

As stated above, Section 2(5) of the Act defines "labor organization" as "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the

---

[13] See *Polaroid Corp.*, 329 NLRB 424, 429 (1999); *EFCO Corp.*, 327 NLRB 372 (1998), enfd. 215 F.3d 1318 (4th Cir. 2000); *E. I. du Pont & Co.*, 311 NLRB 893 (1993); *Electromation, Inc.*, 309 NLRB 990, 994 (1992), enfd. 35 F.3d 1148 (7th Cir. 1994).

purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." The Board has not held that an entity must function in a representative capacity in order to constitute a labor organization as defined in Section 2(5) of the Act. But it is beyond dispute that if an entity does, in fact, function in a representative capacity, this is relevant to labor-organization status. As the Board held in *Electromation*, 309 NLRB at 994, "if the organization has as a purpose the representation of employees, it meets the statutory definition of 'employee representation committee or plan' under Section 2(5) and will constitute a labor organization if it also meets the criteria of employee participation and dealing with conditions of work or other statutory subjects."

Yet the Board in *T-Mobile I* found that T-Voice was not a labor organization without passing on "whether T-Voice acted in a representative capacity." 368 NLRB No. 81, slip op. at 6 fn. 21. Because its analysis cannot be reconciled with the Board's holding in *Electromation* or the policies of the Act on which that holding was based, the Board's failure to address this issue in *T-Mobile I* was error.

Turning to that issue now, we find that T-Voice plainly did act in a representative capacity, and therefore that individual T-Voice employee representatives acted in a representative capacity when serving in their role as T-Voice representatives. As noted above, the employees selected by the Respondent to serve on T-Voice were called "T-Voice representatives." Moreover, the Respondent selected employees from different shifts, call functions, and call centers. And T-Voice representatives repeatedly solicited their co-workers to submit pain points. Indeed, the Respondent described T-Voice to employees as "a direct line of Frontline feedback for senior leadership." The record amply establishes that T-Voice acted in a representative capacity. See *EFCO Corp.*, 327 NLRB at 375 fn. 8 (finding that committees acted in a representative capacity where the employer "sought to secure representation on the committees from all sections and shifts and urged these committees to canvass employees for their opinions regarding policy matters and the committees' proposals"); see also *Aero Detroit, Inc.*, 321 NLRB 1101, 1102, 1113 (1996) (committee members chosen from each department and given title of "team leader"); *Dillon Stores*, 319 NLRB at 1250 (committee members referred to as representatives proposed changes "we" would like to see in "our" terms and conditions of employment); *Electromation*, 309 NLRB at 997 (committee members solicited ideas from other employees for the purpose of reaching solutions that would satisfy the employees as a whole). Since T-Voice acted in a representative capacity, it came

within the Act's definition of a labor organization if it dealt with the Respondent concerning conditions of work or other statutory subjects. *Electromation*, 309 NLRB at 994.

### B.

The statutory term "dealing with" is broader than the term "collective bargaining." *NLRB v. Cabot Carbon Co.*, 360 U.S. 203, 211 (1959). It contemplates "a bilateral mechanism involving proposals from the employee committee concerning the subjects listed in Sec[tion] 2(5), coupled with real or apparent consideration of those proposals by management." *Electromation*, 309 NLRB at 995 fn. 21. As the Board subsequently explained,

> [t]hat "bilateral mechanism" ordinarily entails a pattern or practice in which a group of employees, over time, makes proposals to management, management responds to these proposals by acceptance or rejection by word or deed, and compromise is not required. If the evidence establishes such a pattern or practice, or that the group exists for a purpose of following such a pattern or practice, the element of dealing is present. However, if there are only isolated instances in which the group makes ad hoc proposals to management followed by a management response of acceptance or rejection by word or deed, the element of dealing is missing.

*E. I. du Pont*, 311 NLRB at 894; see also *Vons Grocery Co.*, 320 NLRB 53, 53 (1995) (describing "dealing with" as a "bilateral mechanism between two parties that entails a pattern or practice of *the making of proposals by an employee group* and the acceptance or rejection of those proposals by management") (emphasis added).

The Board has distinguished the "bilateral mechanism" described in *Electromation* and its progeny from unilateral mechanisms, such as a suggestion-box procedure. The use of a suggestion box does not infringe the proscriptions of Section 8(a)(2) because it is unilateral, *Electromation*, 309 NLRB at 995 fn. 21, and because the proposals are made individually and not as a group, *E. I. du Pont*, 311 NLRB at 894. See also *Polaroid Corp.*, 329 NLRB at 425 (holding that a quarterly, 1-day safety conference where "any individual employee may participate" and submit suggestions and comments on safety issues was a lawful employee involvement program).

In addition, to constitute a labor organization under Section 2(5) of the Act, an employee group must deal with the employer regarding one or more of the subjects set forth in that statutory provision: "grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." See *Webcor Packaging*, 319 NLRB 1203, 1205 (1995) (finding employee committee was created by

6              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

employer to deal with it regarding wages and other topics listed in Section 2(5) rather than issues of productivity or plant efficiency), enfd. 118 F.3d 1115 (6th Cir. 1997), cert. denied 522 U.S. 1108 (1998); *Electromation*, 309 NLRB at 998 (finding that purpose of the Action Committee was "not to enable management and employees to cooperate to improve 'quality' or 'efficiency,' but to create in employees the impression that their disagreements with management had been resolved bilaterally").

*C.*

Consistent with the foregoing principles, an employee group does not "deal with" an employer unless that group either makes proposals to management or exists, at least in part, for that purpose. See *E. I. du Pont*, 311 NLRB at 894. But nothing in the text of Section 2(5) or its legislative history supports the notion that the employee group must adopt proposals in any particular way before those proposals may be found to be group proposals. To the contrary, the legislative history of the Act demonstrates that Congress sought to proscribe employer domination of both formally structured unions and more loosely organized employee representation committees or plans. *Electromation*, 309 NLRB at 992–94; see also *NLRB v. Ampex Corp.*, 442 F.2d 82, 84 (7th Cir. 1971) ("The statute has been broadly construed, both with respect to absence of formal organization and the type of interchange between the parties which may be deemed 'dealing.'"), cert. denied 404 U.S. 939 (1971). To be sure, the Board has found statutory "dealing with" where an employee group formally voted on proposals before they were submitted to management. *Polaroid*, 329 NLRB at 429. But the Board has also found that proposals were group proposals absent evidence that the group used a formal procedure of this type. See, e.g., *Electromation*, 309 NLRB at 1017 ("There was a lot of discussion, everyone joined in . . . .").

In both *Electromation* and *Polaroid*, the Board found that employee groups that acted in a representative capacity "dealt with" the employer. In both cases, the Board found labor-organization status. Indeed, we are not aware of any case in which the Board has found that an employee group that acted in a representative capacity and made proposals to management was not "dealing with" the employer and a labor organization.

Whether an employee group acts in a representative capacity is particularly relevant to determining whether the "dealing with" requirement is met where the group presents to the employer suggestions or complaints submitted by other employees. When an employee group was not acting in a representative capacity, the Board did not find statutory "dealing with" when the group did not formulate or present its own proposals to management but instead merely reviewed and forwarded suggestions made by individual employees to the appropriate management committee. *EFCO*, 327 NLRB at 376 & 376 fn. 14 (Employee Suggestion Screening Committee did not act as the employees' representative because it "did not canvass employees [for suggestions] but only informed them as to the action taken on their suggestions."). As the *EFCO* Board recognized, however, the same employee committee would "deal with" an employer if it "weed[ed] out proposals it [did] not wish to advance and recommend[ed] others that pertain to Section 2(5) matters, a process which would, in essence, put the committee in the position of making proposals to management based on the suggestions of other employees." Id. at 376.[14]

The Board has not, however, required evidence that an employee group performs a weeding-out function or otherwise formally adopts suggestions submitted by other employees in cases where the group *is* acting in a representative capacity. *Dillon Stores*, 319 NLRB at 1245, cited by the D.C. Circuit, is a case in point. There, the employee members of Associates' Committees acted in a representative capacity when presenting, at quarterly meetings with management, questions posed or complaints raised by other employees. Indeed, one employee testified that the questions presented to the employer *usually* were ''from other employees, and you just take them because they were brought to you. That's part of being the employee representative.'' Id. at 1250. There was no evidence or finding that the Associates' Committees performed any screening function or otherwise formally adopted proposals submitted by other employees, but the Board nevertheless found "dealing with" because "those proposals and grievances had been advanced collectively, *on a representational basis*." Id. at 1252 (emphasis added).[15]

---

[14] See also *Aero Detroit, Inc.*, 321 NLRB at 1114 (continuous improvement team, acting in representative capacity, decided, as a group, whether to forward employee suggestions to management); *Grouse Mountain Lodge*, 333 NLRB 1322, 1335 (2001) (suggestions and ideas initially raised by individual employees were debated amongst employees in attendance at QA program meetings, sometimes altered, and then submitted to the employer in the name of the QA program rather than as individual employees' suggestions), enfd. 56 Fed. Appx. 811 (9th Cir. 2003); *Ryder Distribution Resources*, 311 NLRB 814, 814 (1993) (wages-and-benefits committee acted in a representative capacity when

its employee members polled the entire employee complement on wages and benefits they wanted and then agreed on a proposal).

We do not consider *Predicasts, Inc.*, 270 NLRB 1117 (1984), and *Steiner-Liff Textile Products Co.*, 259 NLRB 1064 (1982), cited by the General Counsel and the Union, as they have no precedential value in the absence of relevant exceptions. See *Watsonville Register-Pajaronian*, 327 NLRB 957, 959 & fn. 4 (1999).

[15] As the D.C. Circuit noted, the reference in *Dillon Stores* to the proposals being "advanced collectively" meant, in context, "only that the proposals were made 'on a representational basis.'" 994 F.3d at 662.

### D.

Applying these principles to the facts of this case, we find that T-Voice engaged in "dealing with" the Respondent and constitutes a statutory labor organization. As noted above, we agree with the judge that T-Voice and its employee representatives were acting in a representative capacity. We further find that one purpose of T-Voice was to "deal with" the Respondent concerning conditions of work.[16] We recognize that many of the pain points that T-Voice solicited from the employees and presented to the Respondent concerned customer issues. Even assuming arguendo that those pain points did not address conditions of work, many others plainly did. For example, T-Voice dealt with the Respondent regarding metrics, which affected whether CSRs could work in their desired areas and their schedules. And the Respondent credited T-Voice for bringing about a loyalty recognition program, device-charging stations, and free Wi-Fi. We recognize that some of the pain points addressing conditions of work originated with employees who were not T-Voice representatives and may have been presented to the Respondent by a T-Voice representative without any formal process of screening or ratification. We need not reach the issue of whether those proposals would support a finding that T-Voice is a labor organization all the same, insofar as here, they were advanced on a representational basis. See *Dillon Stores,* 319 NLRB at 1252; see also *EFCO,* 327 NLRB at 375 fn. 8, 375–376. Rather, we find that at least one purpose of T-Voice was to deal with the Respondent based on several instances of T-Voice representatives' presentation of proposals that originated with the T-Voice representative acting as a representative of fellow employees.

For example, T-Voice representative Dominique Jones emailed Senior Vice President Field to request 45 dual monitors for CSRs in the Dedicated Care Department. There is no evidence that this proposal originated in a pain point submitted by an employee who was not a T-Voice representative. Moreover, in support of the request, Jones stated that "[t]he majority of dedicated [care] shares this pain point and have been working on getting resolutions for over a year now." This statement made it clear that the request for dual monitors was not just Jones' individual

request but reflected the majority view of the CSRs that Jones was tasked to represent as a T-Voice employee representative. Further, as evidenced by the Respondent's newsletter attributing the proposal to the "T-Voice team," the Respondent treated the proposal as a proposal from T-Voice. See *Grouse Mountain Lodge*, 333 NLRB at 1336 & fn. 25 (finding significant the fact that employee participants of the QA program sometimes submitted suggestions to management in the name of the program rather than as individual employees' suggestions). Moreover, after receiving this proposal, the Respondent reviewed the costs of the monitors and then accepted Jones' proposal by supplying dual monitors to CSRs in the Dedicated Care Department. Indeed, the T-Voice newsletter advised employees that "[t]he T-Voice team was instrumental in raising the need for dual monitors to the Dedicated Care and Special Account Care teams. Solving this pain point should lead to a happier, more productive workplace." Provided this exemplified a pattern or practice of T-Voice proposal and management response, the "bilateral mechanism" requisite to a finding of "dealing with" is established here. See *E. I. du Pont*, 311 NLRB at 894.

We find that it did. Jones' proposal was not an isolated incident. T-Voice representatives also made group proposals for and affecting CSRs during regular meetings with management. For example, in the metrics focus group led by Vice President Bothra at the 2015 summit, T-Voice representatives made proposals concerning the metrics used to measure CSRs' performance, including dropping the high and low scores on customer-satisfaction surveys and excluding from the calculation of a particular metric calls of less than 45 seconds. The minutes of that focus-group meeting, which delineated the proposals by department and metric—rather than by the name of the individual T-Voice representatives who put them forward—indicate that the Respondent considered the proposals as T-Voice proposals. A copy of those minutes was forwarded to other managers for discussion. In addition, at a March national meeting, a T-Voice representative proposed that the Respondent provide CSRs device emulators to aid them in troubleshooting problems with customers' devices. The Respondent promised to provide an update

---

*Reno Hilton,* also cited by the D.C. Circuit, is not to the contrary. In that case, the Board found that quality assurance teams (QATs) were labor organizations where "the QATs or their members made proposals or requests concerning [wages, hours, and other terms and conditions of work] to which the [r]espondent responded by either accepting or rejecting, and . . . those actions occurred on more than an isolated or ad hoc basis." 319 NLRB at 1156. While there was no explicit finding that the QATs acted in a representative capacity, there was also no evidence or indication that the proposals advanced by the QATs originated with other employees. See also *Yukon Manufacturing Co.*, 310 NLRB 324, 335 (1993) (employee committee was a labor organization where its

members, elected or appointed on departmental basis, dealt with employer concerning wages and conditions of work; no explicit finding that committee acted in a representative capacity, but also no evidence that proposals it advanced originated with other employees).

[16] See *Reno Hilton*, supra at 1156–1157 (finding that quality action teams dealt with the respondent concerning statutory subjects because, although most of the topics at meetings did not involve such subjects, Sec. 2(5) states that an organization is a labor organization if it exists, even in part, for the purpose of dealing with the employer concerning those subjects).

on the proposal. At another national meeting, a T-Voice representative suggested that the Respondent provide CSRs with a script for explaining how phone exchanges work. The Respondent added that suggestion to "the list of things to relook." During a focus group session at another national meeting, several T-Voice representatives made suggestions such as "training in sites for coverage device set-up" and "network-specific talking points to help address customer questions." And after receiving an update on the Respondent's new device insurance plans, T-Voice representatives provided feedback on the language to be used in materials for training CSRs on the update, and the Respondent edited the language accordingly. In each case, T-Voice representatives acting in their role as such made proposals affecting conditions of work, and the Respondent either forwarded these proposals to other managers for their consideration, indicated that they would be considered, or simply accepted them.

We disagree with our dissenting colleague, who would find that the numerous aforecited examples are insufficient to establish a pattern or practice of proposals so as to constitute "dealing." Our colleague cites *Stoody Co.,* 320 NLRB 18, 20 (1995), for the proposition that T-Voice's repeated instances of "dealing with" the Respondent over statutory subjects of bargaining were simply "isolated errors" that should not result in a finding of a violation of Section 8(a)(2). In *Stoody Co.*, however, the Board declined to find labor organization status where the employer convened a singular, 1-hour meeting of a Handbook Committee that solicited employee input on working conditions despite management's express statement to employees that the committee "was not to discuss wages, benefits, or working conditions." Id. at 21. The Respondent's establishment of the T-Voice program bears no resemblance to the one-off meeting at issue in *Stoody*, which was described by the Board as having "a brief lifespan of 1 hour only." Id. at 20. By contrast, the Respondent's

own agents concede that the T-Voice program expressly solicited "employee" or "Frontline" pain points over a period of roughly 6 months, until the instant charges were filed asserting that such conduct was unlawful. Thus, these solicitations cannot be deemed an "isolated error," but instead support a finding of a pattern or practice of dealing sufficient to establish that T-Voice constituted an unlawfully dominated labor organization.

Taken as a whole, these ongoing interactions between T-Voice representatives and management establish the existence of a bilateral mechanism through which T-Voice made proposals that were considered by management and, in some cases, outright accepted. See *Aero Detroit*, 321 NLRB at 1101 (continuous improvement team (CIT) dealt with employer where proposals were forwarded to a management team for a final decision); *Ryder Distribution Resources*, 311 NLRB at 818 (finding "bilateral exchange between employees and management regarding wages clearly constituted 'dealing with' within the meaning of Section 2(5)"); *E. I. du Pont*, 311 NLRB at 894 (holding that "the element of dealing is present" where the evidence establishes "a pattern or practice in which a group of employees, over time, makes proposals to management" and "management responds to these proposals by acceptance or rejection by word or deed"); *Electromation*, 309 NLRB at 995 fn. 21 (defining "dealing with" as "a bilateral mechanism involving proposals from the employee committee concerning the subjects listed in Sec. 2(5), coupled with real or apparent consideration of those proposals by management"). And inasmuch as the proposals concerned metrics, training, and equipment for CSRs, they constituted proposals regarding conditions of work.[17] Accordingly, we find that T-Voice existed for the purpose, in part, of dealing with the Respondent on a statutory subject. T-Voice was therefore a labor organization under Section 2(5) of the Act, which the Respondent dominated and assisted in violation of Section 8(a)(2) of the Act.[18]

---

[17] Despite conceding for the purposes of his dissent that these proposals concerned statutory subjects of bargaining, our dissenting colleague alleges that T-Voice was simply an innocuous employee-participation program, asserting that "the Board has never found that an employer-created employee group that was designed to address issues of productivity, product quality, and/or efficiency ran afoul of Section 8(a)(2)." We disagree with this characterization of the T-Voice program, and note that this argument is routinely advanced in cases in which an employee-participation program is found to constitute an unlawfully-dominated labor organization. See, e.g. *UPMC,* 366 NLRB No. 185, slip op. at 5 (2018) (finding unlawful employer domination of a labor organization even where the employer argued that its "Employee Council discussed only quality and efficiency issues"); *Electromation,* supra at 997 fn. 28 (rejecting a similar argument based on the lack of evidence that the purpose of the committees at issue "was *limited to* achieving 'quality' or 'efficiency'") (emphasis added). As in those cases, we find that T-Voice went well beyond "issues of productivity, product quality, and/or efficiency."

[18] Our dissenting colleague asserts that out of the numerous pain points solicited by the Respondent, we cite in this decision to "only six instances" in which the Respondent engaged in "dealing with" T-Voice regarding statutory subjects of bargaining. As noted above, the Act does not require a statutory labor organization to have a primary purpose of dealing with the employer concerning "grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work." All that is required is that it exist "for the purpose, in whole or *in part*, of dealing with employers concerning" one or more of the enumerated subjects. 29 U.S.C. § 152(5) (emphasis added). These representative examples are more than sufficient to establish a pattern or practice of "dealing with" the Respondent, both under the plain language of the Act and its subsequent interpretations. See, e.g., *Reno Hilton,* supra, 319 NLRB at 1157 ("Section 2(5) plainly states that an organization is a labor organization if employees participate in it and if it exists, even *in part,* for the purpose of dealing with the employer concerning those subjects."). Accordingly, the instances of "dealing with" cited above are sufficient to establish that T-Voice is a labor organization even though many, or even

T-MOBILE USA, INC.                                                              9

CONCLUSIONS OF LAW

1. The Respondent, T-Mobile USA, Inc., is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. Communications Workers of America, AFL–CIO and T-Voice are labor organizations within the meaning of Section 2(5) of the Act.

3. The Respondent has engaged in an unfair labor practice in violation of Section 8(a)(2) and (1) of the Act by dominating and assisting T-Voice.

4. The unfair labor practice found above affects commerce within the meaning of Section 2(2), (6), and (7) of the Act.

REMEDY

Having found that the Respondent violated Section 8(a)(2) of the Act by dominating and assisting T-Voice, we shall order it to cease and desist from engaging in such unlawful conduct and to take certain affirmative action designed to effectuate the policies of the Act. Specifically, we order the Respondent to immediately disestablish and cease all support to T-Voice and post an appropriate notice at its call centers where it maintained T-Voice.[19] See *Electromation*, 309 NLRB at 998. Contrary to our dissenting colleague, we find that disestablishment of T-Voice is the necessary and proper remedy to ameliorate the effects of the Respondent's unlawful domination of the labor organization. As early as 1948, in *The Carpenter Steel Company*, 76 NLRB 670, 673 (1948), the Board determined that "[h]enceforth, the Board's policy will be as follows:

> In all cases in which we find that an employer has dominated, or interfered with, or contributed support to a labor organization, or has committed any of these proscribed acts, we will find such conduct a violation of Section 8(a)(2) of the Act . . . Where we find that an employer's unfair labor practices have been so extensive as to constitute *domination* of the organization, we shall

order its disestablishment . . . The Board believes that disestablishment is still necessary as a remedy, in order effectively to remove the consequences of an employer's unfair labor practices and to make possible a free choice of representatives, in those cases, perhaps few in number, in which an employer's control of *any* labor organization has extended to the point of actual domination.

See also *Jack Smith Beverages, Inc.*, 94 NLRB 1401, 1404 (1951), enfd. 202 F.2d 100, 101 (6th Cir. 1953) ("The Board continues to be of the opinion that the *only effective remedy* for a situation in which an employer is found to have unlawfully dominated a labor organization is to order the employer to disestablish the union.") (emphasis added).

Here, the Respondent does not contest, and we adopt, the judge's determination that the Respondent dominated T-Voice. Accordingly, we will follow more than 70 years of Board precedent and order the Respondent to disestablish the unlawfully-dominated labor organization.

ORDER

The National Labor Relations Board orders that the Respondent, T-Mobile USA, Inc., Wichita, Kansas, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Dominating, assisting, or otherwise supporting T-Voice or any other labor organization.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Immediately disestablish and cease giving assistance or any other support to T-Voice.

(b) Post at its facilities where T-Voice is or has been maintained, copies of the attached notice marked "Appendix."[20] Copies of the notice, on forms provided by the

---

most, of its proposals may not have evidenced a purpose of dealing with the Respondent concerning statutory subjects.

[19] For the reasons expressed in his concurrence in *Johnston Fire Services, LLC*, Member Prouty would find a notice-reading remedy fully warranted in this case. 371 NLRB No. 56, slip op. at 6 fn. 23 (2022). As he explained, "[t]he Board's administrative experience demonstrates the greater efficacy of notice reading in achieving the remedial objectives of the Act. Effective vindication of the rights guaranteed by the Act is fundamental to national labor policy in every case before the Board." Ibid. Accordingly, Member Prouty would consider expanding the scope of cases in which remedial relief encompasses notice reading in a future appropriate proceeding. As Member Prouty further stated in *Johnston Fire*, he would also require, in this case and in all other cases in which the Board orders a notice-reading remedy, that each employee present at any meeting in which the notice is to be read be provided a copy of the notice before it is read aloud. Id., slip op. at 7 fn. 24 ("Such a requirement

would facilitate employee comprehension of the notice and enhance the remedial objectives of the notice reading.").

[20] If the facilities involved in these proceedings are open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region. If the facilities involved in these proceedings are closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facilities reopen and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically

10                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Regional Director for Region 14, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since August 23, 2015.

(c) Within 21 days after service by the Region, file with the Regional Director for Region 14 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.  November 18, 2022

_____
Gwynne A. Wilcox,                    Member

_____
David M. Prouty,                     Member

(SEAL)         NATIONAL LABOR RELATIONS BOARD

---

MEMBER RING, dissenting.

Congress enacted Section 8(a)(2) of the Act to ensure that company-dominated labor organizations do not rob employees of their right to select a representative of their own choosing.[1] But Congress just as plainly did not intend to prohibit "all management efforts to communicate with employees concerning company personnel policy."[2] Accordingly, the Board has recognized that "there is some room for lawful cooperation [between employees and management] under the Act."[3]

Consistent with this principle, the Board has long held that a 8(a)(2) violation ordinarily requires proof of "a *pattern or practice*" of a group of employees, over time, making proposals to management that concern conditions of work, grievances, labor disputes, wages, rates of pay, or hours of employment (hereafter "statutory subjects"), and of "management respond[ing] to these proposals by acceptance or rejection by word or deed . . . ."[4] Section 8(a)(2) is not violated, however, if the evidence reveals only "isolated instances" of the employee group making proposals to management concerning statutory subjects.[5]

As the Board has recognized, it is often difficult to separate "such issues as operations and efficiency from" statutory subjects.[6] By requiring evidence of a pattern or practice of making proposals to management on statutory subjects, then, the Board properly "allows for the isolated errors that may occur in any genuine attempt to change the interaction between employer and employees. Such errors or missteps will not result in a finding" that the employer has violated Section 8(a)(2).[7] As explained below, I find evidence of such a pattern or practice lacking in this case.[8] Indeed, out of thousands of employer-employee interactions, my colleagues identify only six instances in which, in their view, T-Voice made proposals to the Respondent

---

on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[1] See *Electromation, Inc.*, 309 NLRB 990, 994 fn. 18 (1992) ("Congress' goal [in enacting Section 8(a)(2)] was to preserve for employees the right to choose their bargaining representative free of employer interference or coercion[.]"), enfd. 35 F.3d 1148 (7th Cir. 1994).

[2] *NLRB v. Streamway Div. of Scott & Fetzer Co.*, 691 F.2d 288, 292 (6th Cir. 1982); see S. Rep. No. 1184, 73d Cong., 2d Sess. (1934), reprinted in 1 NLRB, Legislative History of the National Labor Relations Act, 1935, at 1401 (1949) (noting that "normal relations and innocent communications which are part of all friendly relations between employer and employee" need not be prohibited).

[3] *E. I. du Pont & Co.*, 311 NLRB 893, 893 (1993).

[4] Id. at 894 (emphasis added).

An employer violates Sec. 8(a)(2) if it dominates or interferes with the formation or administration of any labor organization or contributes financial or other support to it. An entity is a labor organization "if (1) employees participate, (2) the organization exists, at least in part, for the

purpose of 'dealing with' employers, and (3) these dealings concern 'conditions of work,' grievances, labor disputes, wages, rates of pay, or hours of employment." Id. An employee group "deals with" an employer if it has a pattern or practice, over time, of making "proposals to management, management responds to these proposals by acceptance or rejection by word or deed, and compromise is not required." Id. The issue presented in this case is whether T-Voice dealt with the Respondent. There is no dispute that if T-Voice is a labor organization, the Respondent dominated it.

[5] Id.

[6] *Stoody Co.*, 320 NLRB 18, 20 (1995).

[7] Id.

[8] As explained by the majority, this case is on remand from the Court of Appeals for the D.C. Circuit. *Communications Workers of America, AFL–CIO v. NLRB*, 994 F.3d 653 (D.C. Cir. 2021). The court there held that the Board had erred in its previous decision, 368 NLRB No. 81 (2019), by imposing a "group proposals" requirement in the face of dueling lines of Board precedent and by failing to explain what the record must show to establish "group proposals." Although I am not certain that the *T-Mobile I* Board intended to draw a distinction between group proposals and proposals by individual members of a group, I would find

concerning statutory subjects. For the purpose of this decision, I will assume that the majority's findings are accurate. Even so, those six interactions were but drops in a sea of communications between T-Voice and the Respondent that addressed customers' concerns and other nonstatutory subjects. I believe that the record falls short of establishing that T-Voice is a labor organization. In addition, because T-Voice has addressed customer concerns *exclusively* since April 2016, there is no justification for the majority's order disestablishing it. Accordingly, I respectfully dissent.

Discussion

1. The T-Voice program falls within permissible employee-employer cooperative efforts.

As part of their efforts to succeed in a competitive global marketplace, many companies have developed employee involvement programs.[9] Employee involvement is particularly important to the competitiveness of a service-based business, such as telecommunications, because employees who engage directly with its customers are well situated to be aware of their needs, sentiments, and complaints. For example, customer service representatives who handle customer questions and problems on a daily basis have valuable insight into how a company's products, services, and business operations could be improved. Getting feedback from customer service representatives about customer experience can help a company improve its offerings, boosting customer satisfaction and corporate profitability.[10] Understanding the importance of employee involvement in its customer relations and business, the Respondent, a national wireless communications carrier, launched and maintained T-Voice, an employee feedback program.[11]

As the record makes abundantly clear, T-Voice was essentially a suggestion-box program the likes of which the Board has found to be a permissible type of employee-employer cooperation. See *EFCO Corp.*, 327 NLRB 372, 376 (1998) (employer lawfully maintained a suggestion-

box program in which employee committee played a ministerial role facilitating the employer's consideration of individual employees' suggestions), enfd. 215 F.3d 1318 (4th Cir. 2000). T-Voice representatives (CSRs) to share their individual concerns, dubbed "pain points," and they entered those pain points in a SharePoint database. The pain points, which with rare exceptions concerned customer issues, were then reviewed by an appropriate manager, who developed a response without consulting T-Voice representatives. T-Voice representatives were not responsible for devising or proposing solutions to the pain points they entered. And their only follow-up duty was to relay any management response to the CSR who had submitted the pain point. To be sure, T-Voice representatives also regularly attended meetings with management. But T-Voice representatives' activities at those meetings were generally consistent with their suggestion-box role: they planned informational events with local managers, reported data on pain points, and received updates from management on previously submitted pain points.

Although T-Voice representatives' participation in focus groups did not strictly and invariably conform to their suggestion-box role, the Board has never found that an employer-created employee group that was designed to address issues of productivity, product quality, and/or efficiency ran afoul of Section 8(a)(2).[12] Here, the overwhelming majority of the matters discussed at the T-Voice focus groups involved customer experiences, such as "situations where customers g[o]t backed into a corner and d[idn't] have a clear way out," "general perceptions about our network," "what sort of pains [] people express[ed] with respect to payments," and "specific issues or services customers [were] directed to a store for resolution." These are not the kinds of subjects that implicate Section 8(a)(2) of the Act.

My colleagues comb through the voluminous record and identify six instances in which the Respondent purportedly dealt with T-Voice concerning statutory subjects.[13] I believe that this handful of instances cited by my

---

[9] Id. at 1156.

[10] See *The Impact of Customer Service on Telecom Success*, Ask (May 26, 2021), https://www.asktelemarketing.com/blog/2021/5/26-the-impact-of-customer-service-on-telecom-success; *The Importance of Customer Service in the Telecommunication Industry to Increase Engagement*, Doxee, https://www.doxee.com/blog/customer-experience/importance-of-customer-service-in-the-telecommunication-industry/ (last visited Aug. 29, 2022).

it unnecessary to pass on whether T-Voice representatives served in a representational capacity when making proposals for purposes of establishing "dealing with" under Sec. 2(5) of the Act. As explained below, I would dismiss the complaint because the General Counsel failed to prove a pattern or practice of T-Voice representatives having made proposals on statutory subjects.

[11] Instead of placing physical suggestion boxes at its call centers, the Respondent utilized a virtual suggestion box and engaged employees, called T-Voice representatives, to solicit their coworkers' ideas.

[12] See, e.g., *Electromation*, 309 NLRB at 997 fn. 28 (declining to reach the question of whether any employer-initiated programs that existed for the purpose of promoting quality or efficiency might constitute a labor organization, the domination of which would violate Sec. 8(a)(2)).

[13] As instances of purported "dealing" between management and T-Voice employee representatives concerning the subjects set forth in Sec. 2(5), the majority cites the following record evidence not mentioned in the judge's decision: (1) T-Voice employee representative Dominique Jones' email asking for dual monitors for CSRs in the Dedicated Care Department at one of the Respondent's 17 call centers, and the

12                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

colleagues is insufficient to establish a "pattern or prac-
tice" of dealing between T-Voice and the Respondent con-
cerning terms and conditions of employment.[14]  As the
record shows, T-Voice representatives processed *thou-
sands* of pain points through the SharePoint database and
met with management on numerous occasions.  In the con-
text of this vast sea of interactions between T-Voice rep-
resentatives and management, the six incidents were, at
most, "isolated instances" in which T-Voice representa-
tives made "ad hoc proposals to management."[15]  As the
Board emphasized in *E. I. du Pont*, such "isolated in-
stances" are insufficient to establish a "pattern or practice"
of dealing with an employee group concerning statutory
subjects.[16]

   For these reasons, I would adhere to the prior Board de-
cision dismissing the complaint allegation that the Re-
spondent violated Section 8(a)(2) and (1) of the Act by
maintaining, supporting, and assisting T-Voice.

   2.  Ordering the Respondent to disestablish T-Voice
       would not effectuate the policies of the Act.

   In any case, I would not order the Respondent to dises-
tablish T-Voice.  As noted above, my colleagues find that
T-Voice was an unlawfully dominated labor organization
based on a handful of interactions that occurred prior to
April 2016.  Even assuming that at one time, one purpose
of T-Voice was to deal with management concerning con-
ditions of work, the record indicates that T-Voice no

longer operates with such a purpose.[17]  As the judge found,
since late February 2016 the Respondent has made clear
that terms and conditions of employment are outside of T-
Voice's purview.  For example, when T-Voice represent-
atives received feedback from employees in April 2016
regarding career development, the Respondent reminded
T-Voice representatives that T-Voice was not a forum for
such issues affecting employment.  Moreover, on July 29,
2016, Vice President Callie Field emailed all CSRs, advis-
ing that T-Voice was to address customer pain points only.
There is no indication that T-Voice subsequently went be-
yond those permissible limits.

   On these facts, I cannot find that the continued existence
of T-Voice would be "a continuing obstacle to the exercise
of the employees' rights of self-organization and to bar-
gain collectively through representatives of their own
choosing"[18] so as to require a disestablishment remedy.  If
anything, the loss of the T-Voice program, at this point,
would be injurious to the Respondent's ability to perform
more efficiently and to respond promptly to customer
needs and changing technology.  The Board has a "duty
and 'broad discretionary' authority under Section 10(c) to
tailor its remedies to varying circumstances on a case by
case basis, in order to ensure that its remedies are congru-
ent with the facts of each case."[19]  Under the circum-
stances presented here, it will not effectuate the polices of
the Act to require the Respondent to disestablish T-Voice,
and my colleagues ought not order it to do so.[20]

Respondent's newsletter crediting T-Voice for raising the need for dual
monitors; (2) the minutes of a focus group on metrics hosted by Vice
President Sid Bothra at the 2015 summit, which listed T-Voice employee
representatives' comments concerning the metrics used to measure em-
ployee performance, and the Respondent's sharing of the minutes among
certain managers for further discussion; (3) the meeting notes from a
March 2016 national meeting, which listed an anonymous suggestion to
provide CSRs device emulators, and Senior Analyst Ryan McDonald's
statement that he would provide updates on next month's call; (4) the
meeting notes from a September 2015 national meeting, which included
a promise to add to "the list of things to relook" a T-Voice employee
representative's suggestion to provide CSRs with a script for explaining
to customers how phone exchanges work; (5) the notes from a January
2016 national meeting, which recorded T-Voice employee representa-
tives' suggestions during a "Coverage and Network" focus group ses-
sion, such as "training in sites for coverage device set-up" and "network-
specific talking points to help address customer questions"; and (6) the
notes from a January 2016 national meeting, which reported that the Re-
spondent edited the language in training materials concerning the Re-
spondent's new device insurance plans based on employee feedback.  In
addition to the determinatively small number of these instances identi-
fied by the majority, each one also undeniably overlapped with opera-
tions, efficiency or customer service concerns, the lawful focus of T-
Voice.

[14]  See *Stoody Co.*, 320 NLRB at 19 (dismissing 8(a)(2) allegation
because the employee committee "did not engage in a pattern or practice
of dealing with the [r]espondent on employment conditions").  Although
*Stoody Co.* involved a single instance of an employee committee making
proposals to management concerning statutory subjects, the Board did

not cap the number of permissible instances at one or otherwise draw a
line beyond which a pattern or practice would be established.  Rather, it
reiterated the holding of *E. I. du Pont* that a pattern or practice requires
more than "'isolated instances.'"  Id. at 20 (quoting *E. I. du Pont*, 311
NLRB at 894).

[15]  *E. I. du Pont*, 311 NLRB at 894.

[16]  The isolated incidents cited by the majority underscore the chal-
lenge that employers face when establishing employee involvement pro-
grams.  That is, even when an employee involvement group is created to
address and solve significant productivity and efficiency challenges, em-
ployees might occasionally drift off-topic into a statutory subject.  Em-
ployers should take steps to discourage this, and when it happens, they
can and should avoid accepting or rejecting such suggestions "by word
or deed."  *E. I. du Pont & Co.*, 311 NLRB at 894.  However, the Board
has made it clear that isolated incidents will not turn a lawful employee
involvement program into a labor organization.  See *Stoody Co.*, 320
NLRB at 20 ("By requiring . . . a pattern or practice of making proposals
to management on the subjects covered in Sec[.] 2(5), *du Pont* allows for
the isolated errors that may occur in any genuine attempt to change the
interaction between employer and employees.").

[17]  See *Electromation*, 309 NLRB at 1004 fn. 1 (Member Oviatt, con-
curring) (noting that purpose of the entity "may change over time").

[18]  *NLRB v. Pennsylvania Greyhound Lines*, 303 U.S. 261, 270 (1938).

[19]  *Diamond Walnut Growers, Inc.*, 340 NLRB 1129, 1132 (2003); see
*NLRB v. MacKay Radio & Telegraph Co.*, 304 U.S. 333, 348 (1938)
("[T]he relief which the statute empowers the Board to grant is to be
adapted to the situation which calls for redress.").

[20]  Cf. id. at 270–271 (assuming that there are situations in which the
Board would not be warranted in concluding that disestablishment of a

T-MOBILE USA, INC.                                                                    13

CONCLUSION

Congress did not intend Section 8(a)(2) of the Act to become an obstacle to the implementation of all forms of employee feedback programs. T-Voice was intended to serve as a lawful employee feedback program, and it operated that way in practice with at most a few rare and isolated exceptions. The record as a whole simply does not support the notion that T-Voice robbed employees of their right to select representatives of their own choosing. This point is reinforced by the Respondent's reiteration in July 2016 that T-Voice could only address customer pain points and the absence of any evidence that this limitation has been contravened. Its disestablishment now would serve no useful purpose. Accordingly, I respectfully dissent.

Dated, Washington, D.C. November 18, 2022

_____
John F. Ring,                                    Member

NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT dominate, assist, or otherwise support T-Voice or any other labor organization.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL immediately disestablish and cease giving any assistance or support to T-Voice.

T-MOBILE USA, INC.

The Board's decision can be found at www.nlrb.gov/case/14-CA-170229 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



---

labor organization may be an appropriate remedy); *NLRB v. Newport News Shipbuilding & Dry Dock Co.*, 308 U.S. 241, 251 (1939) (finding that the facts supported the Board's "conclusion that the purpose of the law could not be attained without complete disestablishment of" the employer-dominated labor organization).

*Carpenter Steel Co.*, 76 NLRB 670 (1948), and *Jack Smith Beverages, Inc.*, 94 NLRB 1401, 1404 (1951), enfd. 202 F.2d 100 (6th Cir. 1953), cited by my colleagues, are readily distinguishable. In both cases, the respondent continued to deal with the labor organization through the date of the hearing. See *Carpenter Steel Co.*, 76 NLRB at 680 (finding that the Employees' Representation Committee, "[e]ver since its original formation . . . has continued to function and to be recognized by the respondent as the exclusive bargaining agency for the respondent's employees"); *Jack Smith Beverages*, 94 NLRB at 1415 (finding the contract between the respondent and the unlawfully dominated labor organization to be "presently existing").

## CERTIFICATE OF SERVICE

I hereby certify that, on January 9, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the D.C. Circuit using the Court's CM/ECF system, which will send notifications of such filing to all CM/ECF counsel of record.

*/s/ Mark Theodore*

2